REPUBLIC OF TRINIDAD AND TOBAGO

CA Nos. 49, 50, 52 53 of 2007

## IN THE COURT OF APPEAL

## LEON NURSE AND RICARDO DE FOUR AND DEVON DEMERIEUX AND ZION CLARKE

Appellants

### AND

## THE COMMISSIONER OF PRISONS AND
## THE ATTORNEY GENERAL OF TRINIDAD AND TOBAGO

Respondents

PANEL:  Warner J. A.
Kangaloo J.A.
Mendonca J.A.

APPEARANCES:  Mr. T. Guerra S.C., Ms. K. Berkeley  for the Appellant Leon Nurse, Mr. K. Scotland, Mr. L. Merry and Ms. Lyons  for the Appellant Ricardo De Four  and Mr. L. Gokool  for the Appellants Devon Demerieux and Zion Clarke.
Ms. D. Seetahal S.C., Mr. D. West, Ms. T. Bhagwandeen and Ms. A. Watkins for the Respondents

DATE DELIVERED: May 12, 2008

| Post-it® Fax Note | 7671 | Date 13 5 08 | # of pages ▶ 51 |
|---|---|---|---|
| To Jeff Olson | | From David West | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # 202 -564 -0080 | | Fax # 868-627-9171 | |

**Delivered by Mendonca J. A.**

1.      On April 30, 2008 we dismissed these appeals from the refusal of the Appellants'
applications for writs of habeas corpus. We indicated then that we would give our reasons
in writing and this we now do.

2.      The background facts are not lengthy or complicated. This matter rose out of the
report of kidnapping for ransom in this jurisdiction of Balram Maharaj, his subsequent
death, and the conspiracy to kidnap his son Dinesh Maharaj during the months of March
and April, 2005.

3.      The Appellants, all citizens of Trinidad and Tobago, were on April 26, 2006
indicted by a Grand Jury in the United States of America (US) in connection with the
kidnapping and death of Balram Maharaj and the conspiracy to kidnap Dinesh Maharaj.
They were charged under Title 18, United States Code section 1203 with the offences of
conspiracy to commit hostage taking resulting in death and hostage taking resulting in
death and aiding and abetting and causing an act to be done.

4.      Following the Grand Jury indictment the Attorney General received a formal
request from the US for the Appellants' extradition to that country to stand trial for the
offences for which they were charged. The request was made to the Attorney General
pursuant to the provisions of the Extradition (Commonwealth and Foreign Territories)
Act (herein after called the "Extradition Act"), the Extradition Treaty between the
Government of the USA and the Government of Trinidad and Tobago and The
International Convention Against the Taking of Hostages.

5.      On June 23, 2006 the Attorney General issued the authority to proceed in respect
of each of the Appellants pursuant to section 9 of the Extradition Act. The authority to
proceed identified as the corresponding local offences, offences contrary to section 3 of
the Taking of Hostages Act. So far as is material this section provides as follows:

3. (1) Any person, whatever his nationality, who, in Trinidad and Tobago or elsewhere, seizes or detains any other person, in this subsection referred to as "the hostage", and in order to compel a State, international intergovernmental organisation or any person to do or abstain from doing any act, threatens to kill, to injure or to continue to detain the hostage, commits an offence.

(2) Any person, whatever his nationality, who, in Trinidad and Tobago or elsewhere-

   (a) attempts to commit an offence referred to in subsection (1); or

   (b) aids, abets, counsels or procures, the commission of an offence referred to in subsection (1) or of an attempt to commit such an offence

commits an offence.

6. The matters were heard before the Chief Magistrate in the months of August and September, 2006 and in October 2006 the Chief Magistrate committed the Appellants to custody pursuant to section 12 of the Extradition Act to await the warrant of the Attorney General for their extradition to the US.

7. The Appellants however applied to the High Court for a writ of habeas corpus. The matter came on for hearing before Dean-Armorer J. In a detailed judgment the Judge dismissed the Appellants' applications. The Appellants now appeal to this Court.

8. The Appellants rely on several grounds of appeal and we will refer to them as they are discussed below. We will first refer to the grounds advanced on behalf of the Appellant Leon Nurse. Some of these grounds are also taken by some or all of the other Appellants and where they are, we will refer to them and consider them together.

9.    The first three grounds of appeal of the Appellant Nurse may be taken together as they raise related issues.  They are:

1.    the learned Judge erred in law in holding that the submission by the Appellant that Balram Maharaj was a citizen/national of Trinidad and Tobago was irrelevant in the proceedings;

2.    the learned Judge erred in giving undue weight and or irrelevant consideration to the evidence of Doreen Alexander on the question of nationality;

3.    the learned Judge erred in holding that the requesting state had produced evidence to show that Balram Maharaj is a citizen of the USA and further that this was sufficient having regard to the "modest" role of the extradition judge.

10.    Similar grounds of appeal were also argued by the other Appellants.  In the written arguments of the Appellant Ricardo De Four he argues that "the learned Judge erred in holding that there was sufficient evidence before the Magistrate to show that Balram Maharaj was a US citizen" and the other Appellants submit that there was no evidence that Balram Maharaj was a citizen of the US "in order to exercise extra-territorial jurisdiction and for the offence to be extraditable".

11.    To better appreciate these grounds of appeals it is necessary to refer to the US legislation under which the Appellants were charged.  As we mentioned they were charged under Title 18 United States Code section 1203.  This section provides as follows:

"1203 Hostage Taking

(a)          Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure or to continue to detain another person in

order to compel a third person or a governmental organization to do abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(b)      (1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless-

    (A)   the offender or the person seized or detained is a national of the United States;

    (B)   the offender is found in the United States; or

    (C)   the governmental organization sought to be compelled is the government of the United States."

12.     The effect of the section, so far as is pertinent to this appeal, is that hostage taking which occurs outside of the US is an offence against US law if subsection (b) is satisfied. Of relevance to this appeal is (b) (1) (A). In this case the offenders are citizens of Trinidad and Tobago and were found in this jurisdiction. The US however claim that Balram Maharaj, the person who was seized and detained, is a national of the US and it is not disputed that "national of the US" means a citizen of the US.

13.     The Appellants however submit that Balram Maharaj was a citizen of Trinidad and Tobago. Attention was drawn to the fact that he was born in this jurisdiction before the country achieved its independence in 1962. It is therefore submitted that in those circumstances he became a citizen of Trinidad and Tobago on independence and remained so unless he renounced his citizenship. The Appellants argue that there was no evidence of renunciation so Balram Maharaj remained a citizen of Trinidad and Tobago. As he was a citizen of Trinidad and Tobago he could not be a citizen of the US.

14.   The Appellants accepted that whether one is a national of the US is to be determined by the domestic law of that country. Yet for the proposition that if Balram Maharaj was a citizen of Trinidad and Tobago he could not be a citizen of the US, the Appellants produced no evidence of US law. The submission is therefore not one that carries any persuasion. As the Appellants acknowledge the fact that someone may be a citizen of Trinidad and Tobago by birth does not mean that he remained a citizen of this country. He may by declaration, which is to be registered at the office of the responsible Minister, renounce his citizenship and so cease to be a citizen of Trinidad and Tobago (see section 16 of the Citizenship of the Republic of Trinidad and Tobago Act). Therefore to point to the fact that someone might have been born in Trinidad and Tobago is not evidence that he is a citizen of Trinidad and Tobago and so evidence of the place of his birth is not evidence that Balram Maharaj was at the time of his death a citizen of this country. Even if there were evidence that he was a citizen of this country it would be of little import unless there was evidence that he could not also be a citizen of the US.

15.   There are however clear statements in the records of the case that Balram Maharaj was at the time of his death a citizen of the US. But the Appellants submit that the records of the case do not contain sufficient or any evidence that Balram Maharaj was a citizen of the US.

16.   The record of the case in relation to each Appellant states that at paragraph 27

"The United States will establish that through self-authenticating United States Government passport documents, and through witnesses, that at all times relevant to these offenses, Balram Maharaj and Dinesh Maharaj were citizens of the United States."

17.   The relevant provisions in the Extradition Act relating to the record of the case are as follows:

9(2)    There shall be furnished with any request made for the purposes of this section on behalf of any territory a record of the case which shall include-

   (a)    in the case of a person accused of an extraditable offence, a warrant for his arrest issued in that territory and a document summarising the evidence available to that territory for use in the prosecution of the person;

          ....

   (c)    particulars of the person whose return is requested;

   (d)    particulars of the facts upon which and the law under which he is accused or was convicted;

   (e)    evidence that provision is made by the law of that territory for the speciality rule provided for by section 8(3), where the speciality rule is not made by an arrangement with that territory; and

   (f)    evidence sufficient to justify the issue of a warrant for his arrest under section 10.


19A. (2)  The following evidence is admissible in proceedings under this Act, even if the evidence would not otherwise be admissible under the laws of Trinidad and Tobago:

   (a)    the contents of the documents contained in the record of the case or in supplementary evidence, certified under subsection (5);

   (b)    the contents of the documents that are submitted in conformity with the terms of a treaty with a declared foreign territory; and

   (c)    evidence adduced by the person whose return is sought that is relevant to the tests set out in section 12(4) if the Magistrate considers it reliable.

(5)    A record of the case or supplementary evidence shall not be admitted unless-

    (a)    in the case of a person who is accused of an extraditable offence, a judicial or prosecuting authority of the declared Commonwealth or foreign territory certifies that the evidence summarized or contained in the record of the case or in the supplementary evidence is in a form that would be admissible at the trial and

        (i)    was gathered according to the law of that territory; or

        (ii)    is sufficient under the law of that territory to justify prosecution; or

    .....

    (c)    each document contained in the record of the case or in supplementary evidence bears the signature of the certifying official.

18.    There is no issue that the records of the case comply with section 19A (5). The certificate under section 19A (5) (a) of the relevant prosecuting authority certifies that "the evidence summarized or contained in the record of case and in the other documents attached to this certificate would be admissible for the prosecution of the accused and is sufficient under the law of the United States of America to justify prosecution". Under section 9 (2) the record of the case shall include a document summarizing the evidence available for use in the prosecution of the person. Under section 19A (2) the contents of documents in the record of the case are admissible even if the evidence would not be admissible under the laws of Trinidad and Tobago.

19.    The effect of similar provisions in the Canadian legislation was considered in the case of **USA v Yang** 203 D.L.R. 4th 337. It was stated that the record of the case need only contain a summary of the evidence and that evidence which might not ordinarily be admissible under the ordinary criminal law would be admissible. In particular the Court noted that hearsay evidence was admissible although it would not meet a common law or statutory exception. Opinion and character evidence would also be admissible although it

might not be admitted in a domestic trial. The effect of the provision is to permit the requesting state to rely upon the same type evidence that it could use to try the accused in that country. The certificate requirement ensured that a high official certified that this is what would happen.

20.     In **Yang** it was also pointed out that the extradition judge or in this jurisdiction the magistrate has a modest role. The hearing before the Magistrate acts as a modest screening device. Reliability of the evidence is not a matter for the Magistrate but for the trier of fact in the requesting state.

21.     In **USA v Shulman** (2001) 152 CCC (3d) 294 at 316Arbour J. said:

> "Weighing the evidence or assessing credibility is not part of the extradition judge's jurisdiction …. and it is not open to that judge to assume responsibility over the actions of foreign officials in preparing evidence or to assume that foreign courts would not give the fugitive a fair trial or cannot proper weigh evidence."

22.     Similar notions were expressed in **R v Governor** of **Pentonville Prison ex p. Osman (No. 1)** [1989] 3 ALL ER701 by Lloyd LJ. (at p. 721) where he said

> "In our judgment, it was the magistrate's duty to consider the evidence as a whole, and to reject any evidence which he considered worthless. In that sense it was his duty to *weigh up* the evidence. But it was not his duty to *weigh* the evidence. He was neither entitled nor obliged to determine the amount of weight to be attached to any evidence or to compare one witness with another. That would be for the jury at the trial. It follows that the magistrate was not concerned with the inconsistencies or contradictions in Jaafar's evidence, unless they were such as to justify rejecting or eliminating his evidence altogether. Nor, or course, was he concerned with whether Jaafar's evidence was corroborated."

23.     It was further pointed out in **Yang** that it is only where the record of the case is so bereft of detail that the Magistrate should discharge the accused. In that case Rosenberg JA stated (at para. 63):

> If the material presented in the record of the case is so bereft of detail, such as the witness' means of knowledge, that the judge cannot determine its sufficiency, the judge will have to discharge the person sought for prosecution. This is not a question of the judge weighing the evidence or passing on its reliability, but of carrying out the function assigned by statute. For example, if the record of the case contained a statement that the police suspected the fugitive committed the offence, without stating the basis for this opinion, and this was the only evidence proffered by the extradition partner as proof that the fugitive committed the offence then, even if this opinion was admissible in the requesting state as proof of the offence, it would not be sufficient to meet the s. 29 test for committal because it would have no probative value."

24.     In this case the records of the case contain a summary of the evidence. On the issue of the nationality of Balram Maharaj it is stated that he is a US citizen and that US government passport documents and witnesses establish this. This may be hearsay but it is admissible under the Extradition Act. It is not such a baseless statement that no regard can be paid to it.

25.     Further as the Judge noted there was other evidence before the Chief Magistrate as to the nationality of Balram Maharaj. This came from Doreen Alexander whose oral evidence the Chief Magistrate admitted under section 19A (2) (c). According to her evidence she had a common law relationship with Balram Maharaj and that relationship produced a son named Dinesh Maharaj. She testified under cross-examination that they were both citizens of the US and that in fact her son had obtained his citizenship through his father Balram Maharaj. The Appellants say that no regard should have been paid to this evidence since it is personal opinion and is irrelevant. It should be noted that under the section for evidence to be admissible it may not be otherwise admissible under the

laws of this jurisdiction. In any event we are unable to agree with the Appellants' submission. Her evidence as to the nationality of Balram Maharaj cannot be treated as mere personal opinion. It is evidence of her own knowledge derived from her relationship with Balram Maharaj and her son.

26.    In the circumstances it is not possible to say that the material presented was so bereft of detail that it was wrong to commit the Appellants.

27.    Even if it can be said that in some way the evidence of the birthplace of Balram Maharaj conflicted with the evidence of his citizenship, given that the role of the magistrate is to weigh the evidence and not to determine its reliability, the Chief Magistrate could not reject the evidence that Balram Maharaj was at the material time a citizen of the US. Evidence of the birthplace could not in the circumstances of the case render the evidence of citizenship worthless. I think that Dean-Armorer J. was correct to conclude as she did when she said (at p. 43):

> 18. Moreover the learned Chief Magistrate heard evidence on behalf of the Applicant which tended to prove that the victim was a national of the US. Doreen Alexander, who testified on behalf of the Applicant admitted under cross-examination that the victim was a citizen of the US.
>
> 19. The Chief Magistrate, in exercising the modest role of extradition judge was not required to assess the countervailing effect of the birth certificate that the victim was a national of Trinidad. As long as there was evidence that the victim was a national of the US, the Chief Magistrate was not obligated to adjudicate on weight. See **Osman No. 1.**

28.    The Appellant, Nurse, further submits that the Taking of Hostages Act should be read in line with the International Convention Against the Taking of Hostages so that

where the alleged offender and the person who was seized and detained are citizens of this country, the State would not pursue extradition proceedings. The Appellant argues that the material provision in the Convention is Article 13 which provides as follows:

> "This Convention shall not apply where the offence is committed within a single State, the hostage and the alleged offenders are nationals of that State and the alleged offender is found in the territory of that State."

29.   As we mentioned, it is not in dispute that the offence happened in this jurisdiction and the alleged offenders are nationals of Trinidad and Tobago. What the Appellant have contended is that Balram Maharaj was a national of this country and we have already dealt with this. The premise on which this submission is based therefore has not been established. The argument would also not have arisen if there was no evidence that Balram Maharaj was a national of the US as there could be no offence under US law. There is therefore no need to consider this submission, but in deference to Counsel for the Appellant we will do so.

30.   A convention or treaty does not form part of domestic law unless and until it has been incorporated into it. As such, individuals cannot derive rights directly from it or be deprived of any right or be subject to any obligation directly by the treaty or convention. The Taking of Hostages Act was an Act passed to give effect to The International Convention Against the Taking of Hostages. The Act therefore does not incorporate the Convention but seeks to give effect to it. It is common ground that Article 13 of the Convention has not been expressly incorporated into the Taking of Hostages Act nor is there anything in the Act that expressly gives effect to it. The Appellant however argues that effect may be given to Article 13 and that he may still derive the benefit of it in one of three ways. Firstly, the Convention may influence the construction of the Act so that the Act may be construed as containing the provisions of Article 13 so that nationals of this country in the circumstances envisaged in Article 13 will not be subject to extradition.

31.     However it is well settled that the terms of a treaty or a convention will only be resorted to in order to resolve any ambiguity or obscurity in the statute. In **Maclaine Watson and Co. Limited v The Department of Trade and Industry** [1989] 3 ALL ER 523, 545 Lord Oliver stated:

> "Again, it is well established that where a statute is enacted in order to give effect to the United Kingdom's obligations under a treaty the terms of the treaty may have to be considered and, if necessary, construed in order to resolve any ambiguity or obscurity as to the meaning or scope of the statute."

32.     The Judge found that there was no ambiguity or obscurity in the Taking of Hostages Act and we agree with her. There was certainly no attempt by the Appellant before this Court to demonstrate any ambiguity or obscurity in the Act.

33.     Secondly the Appellants contend that the Court may have regard to Hansard to aid in the interpretation of the act so as to arrive at its true intention. If that is done it is argued that the intention of the legislature not to submit nationals for extradition is clearly expressed.

34.     We cannot accept this submission. In **Pepper v Heart** [1993] 1 ALL ER 42 it was held that three conditions should exist before reference is made to Parliamentary materials. This is evident from the speech of Lord Oliver where he said (at p. 64):

> "In my judgment, subject to the questions of the privileges of the House of Commons, reference to parliamentary material should be permitted as an aid to the construction of legislation which is ambiguous or obscure or the literal meaning of which leads to an absurdity. Even in such cases references in court to parliamentary material should only be permitted where such material clearly discloses the mischief aimed at or the legislative intention lying behind the ambiguous or obscure words. In the case of statements made in Parliament as at

present advised I cannot foresee that any statement other than the statement of the minister or other promoter of the Bill is likely to meet these criteria."

35.   The three conditions that should exist before reference can be made to Parliamentary materials are therefore (a) the legislation is ambiguous or obscure or the literal meaning leads to an absurdity, (b) the material relied on consists of statements by a minister or other promoter of the Bill which led to the enactment of the legislation and (c) the statements relied on clearly reveal the legislative intention.

36.   In this matter the material on which the Appellant attempted to rely consisted of statements of a minister or other promoter of the Bill which led to the enactment of the Taking of Hostages Act so that condition is satisfied. In our judgment however the other conditions are not satisfied.

37.   The Appellant further submits that there is a legitimate expectation that the State will observe the Convention. Perhaps this submission is best encapsulated in the following ground of appeal in the written arguments of the Appellant, Ricardo De Four:

"The ratification of the International Convention on the Taking of Hostages created a legitimate expectation that the Attorney General acting as an agent of the State would not pursue the extradition of an accused where the offence was committed in this country and both the alleged assailant and the alleged hostage were citizens of this country."

38.   In support of this ground, reference was made to the case of **Minister of State for Immigration and Ethnic Affairs v Teoh** (1995) 183 CLR 273. In that case the Court held that ratification of a convention could give rise to a legitimate expectation that the executive government and its agencies will act in accordance with the convention. In the judgment of Mason CJ and Dean J as to the status of the convention (in that case the United Nations Convention on the Rights of the Child) in Australian law stated (at para 34):

"...ratification of a convention is a positive statement by the executive government of this country to the world and to the Australian people that the executive government and its agencies will act in accordance with the Convention. That positive statement is an adequate foundation for a legitimate expectation, absent statutory or executive indications to the contrary, that administrative decision-makers will act in conformity with the Convention (18) and treat the best interests of the children as "a primary consideration". It is not necessary that a person seeking to set up such a legitimate expectation should be aware of the Convention or should personally entertain the expectation; it is enough that the expectation is reasonable in the sense that there are adequate materials to support it."

39.    We accept that statement as correct in principle but it does not assist the Appellants here and the reason is indicated in the statement itself. The Appellants cannot have a legitimate expectation where there are "statutory or executive indications to the contrary". So that where Parliament chose to give effect to the international obligations of the country in some other way than expressed in the convention there can be no legitimate expectation that the State will act in accordance with it (see **The Queen (on the application of Pepushi) v Crown Prosecution Service** [2004] EWHC 798). Indeed Parliament is free to act in breach of its international obligations. As Lord Hoffman said in **R v Lyons** [2002] UKHL 44:

"If Parliament has plainly laid down the law, it is the duty of the courts to apply it, whether that would involve the Crown in breach of the international treaty or not."

40.    In this case Parliament has enacted the Taking of Hostages Act after the country became a signatory to the Convention. By the Act, Parliament created a new offence in section 3. It made that offence an extraditable offence without any limitation as to the nationality of the hostage or the circumstances outlined in Article 13. In these

circumstances there can be no legitimate expectation that the State will give effect to Article 13.

41.    We turn to another ground of appeal advanced by the Appellant Nurse and this relates to the constitutionality of section 19A (2) (c) of the Extradition Act which has been set out earlier in this judgment.  It is contended that under section 19A (2) (c) evidence adduced by the accused must be considered to be reliable by the Magistrate whereas there is no such hurdle confronting the requesting State under section 19A (2) (a) which deals with the admissibility of the record of the case.  The Appellant argued that this additional burden of reliability on the accused that is not put on the requesting State contravenes his right under section 4 (b) of the Constitution to equality before the law.

42    It is well established that the right to equality before the law may be infringed by legislation which discriminates between persons on an irrational basis.  This provision does not appear to meet that test and it seems to us that it is open to the legislature to provide a test of reliability before the evidence of the accused is admitted.  But it is not necessary to determine this issue as in the context of this appeal it is an academic one. We say so because section 19A (2) (c) determines admissibility of evidence and under this section the Magistrate may admit the evidence of the accused if he considers it reliable.  In this case the evidence adduced by the Appellant was admitted and he was not therefore prejudiced.  Whether section 19A (2) (c) is unconstitutional or not cannot in this case lead to the discharge of the Appellant since the evidence he wished to have admitted was in fact admitted.

43.    The next ground of appeal by the Appellant, Nurse, relates to non disclosure.  It is contended that there was an abuse of process by the requesting state on the basis of non disclosure and that the requesting state was in breach of its duty of candour in the context of its disclosure obligations.  The other Appellants advanced similar arguments.  The appellant De Four argues that the learned Judge erred in holding that there was no abuse of process by the requesting state on the basis of non disclosure as alleged by the Appellant and Counsel for the Appellants, Kevon Demerieux and Zion Clarke, submitted

that the requesting state was mandated to make full and frank disclosure to the Appellants.

44.    It is important to note that the extradition process is different from the domestic criminal process. In **Kindler v Canada (Minister of Justice)** [1991] 2 S.C.R. 779, 844 McLachlin J. put the point in these terms:

> "While the extradition process is an important part of our system of criminal justice, it would be wrong to equate it to the criminal trial process. It differs from the criminal process in purpose and procedure and, most importantly, in the factors which render it fair. Extradition procedure, unlike the criminal procedure, is founded on the concepts of reciprocity, comity and respect for differences in other jurisdictions."

45.    It is therefore not surprising to find that different principles of disclosure apply in extradition proceedings from those that apply in domestic criminal trials. In **Ralston Wellington v The Governor of HMP Belmarsh** [2004] EWHC 418 (Admin.) the issue of disclosure in extradition proceedings was considered. After reviewing the authorities the Court stated the following six propositions (at para 26):

1.    It is for the requesting state to determine the evidence upon which it relies to seek a committal.

2.    The requesting state is not under any general duty of disclosure similar to that imposed on the prosecution at any stage in criminal domestic proceedings.

3.    The Magistrates' Court has the right to protect its process from abuse. The requesting state has a duty not to abuse that process. That is no different from saying that the requesting state must fulfil the duty which it has always had of candour in making applications for extradition.

4. In fulfilment of that duty, the requesting state must disclose any evidence which would render worthless the evidence on which it relies to seek committal.

5. It is for the person subject to the extradition process to establish that the requesting state is abusing the process.

6. The requesting state may be given power to request further evidence under the relevant Order in Council but, in the absence of evidence of abuse, the court is entitled to, and should generally, refuse to request the UK authorities to exercise that power or to adjourn to permit it to be exercised.

46. In the Privy Council Appeal 64 of 2004 and 70 of 2005 **Knowles v The Government of the United States** the Privy Council agreed that the requesting state is not under any general duty of disclosure similar to that in an ordinary criminal trial and endorsed the approach in the **Wellington** case. Lord Bingham in giving the advice of the Board stated:

> "But a requesting state is not under any general duty of disclosure similar to that imposed on a prosecutor in English criminal proceedings. It does, however, owe the court of the requested state a duty of candour and good faith. While it is for the requesting state to decide what evidence it will rely on to seek a committal, it must in pursuance of that duty disclose evidence which destroys or very severely undermines the evidence on which it relies. It is for the party seeking to resist an order to establish a breach of duty by the requesting state. The Board would endorse the general approach laid down by Mitting J (sitting with Lord Woolf CJ in the Divisional Court) in **Wellington v Governor of HMP Belmarsh** [2004] EWHC 418 (Admin), para 26."

47. In extradition proceedings therefore it is for the requesting state to determine the evidence upon which it relies to seek a committal. It is not under a general duty of disclosure similar to that of a criminal trial. The requesting state is however under a duty of candour and good faith. In fulfilment of that duty the requesting state must disclose

evidence that destroys or very severely undermines the evidence on which it relies. It is for the person whose extradition is sought to establish a breach of duty by the requesting state.

48.    In this matter there is no material to suggest that the requesting state is in possession of evidence that destroys or undermines the evidence on which it relies. The only thing the Appellants can point to is the evidence which shows that Balram Maharaj was born in Trinidad and Tobago. This, as has already been discussed, does not in any way severely undermine or destroy the evidence on which the requesting state relies. There is therefore no merit in these grounds of appeal.

49.    The next ground of appeal advanced by the Appellant Nurse relates to the convenient forum. The Appellant formulated the ground of appeal as follows:

"The learned Judge erred in law in failing to determine that the issue of forum non conveniens has been properly raised at this stage of the proceedings and is a relevant consideration."

50.    A similar ground of appeal was advanced by the Appellant De Four but it was not pursued at the hearing of the appeal.

51.    The Judge held that the plea of forum non conveniens is properly raised at the trial in the requesting state and is not one to be considered at this stage. The Appellant however contended that this is a ground that may be taken into account by the Court on the hearing of the habeas corpus application under section 3 to discharge the accused. It was submitted that the principle of forum non conveniens is a relevant consideration which may point to an unjust or oppressive mechanism against the Appellant.

52.    We would think that it is open to the Appellant on the habeas corpus application to demonstrate that his surrender to the foreign territory would be unjust or oppressive. This submission however does not get off the ground because there is no evidence on the

part of this Appellant that would show that his surrender to the US would amount to an "unjust or oppressive mechanism" against him. At the end of the day what the Appellant was contending is that the more convenient forum is this jurisdiction. The Appellant referred to the case of **USA v Controni** [1989] 1 SCR 1469 which sets out a number of factors that will usually affect a decision whether to prosecute the person whose surrender is sought in this jurisdiction or to permit his extradition. The decision however whether to extradite the person to the foreign state is a decision of the executive and resides in the Attorney General. As was said in **USA v Chang** 205 CCC 3rd 258 "the decision to surrender is for the executive and not for the Court". While the decision to return is reviewable it is "a unique executive function" (see Civil Appeal 60 of 2007 **Ferguson and Galbaransingh v The A.G.** at para 76). The fact of the matter however is that in this case the Attorney General has not made a decision for the surrender of the Appellant. It is therefore in our judgment premature to raise the forum issue.

53.     The last ground of appeal that the Appellant Nurse sought to argue was that of bias. It was raised in response to two affidavits filed (on November 20 and 21, 2007) on behalf of the Respondents during the hearing of the appeal. The purpose of the affidavits was to put before the Court evidence of an undertaking by the Attorney general of the US that the US will not seek the death penalty against the Appellants. This undertaking was given at the request of the Attorney General of Trinidad and Tobago. The Appellant Nurse submitted that by seeking the undertaking that the prosecution will not seek the death penalty points to the Attorney General having made a pre-emptive decision as to the surrender of the accused and amounts to apparent bias.

54.     Counsel for the Appellants, Clarke and Demerieux, objected to the use of the affidavits on the ground of relevance.

55.     The request by the Attorney General for the undertaking not to enforce the death penalty was informed by section 16 (4) of the Extradition Act. This section provides that the Attorney general may decide not to order the return of the person accused if he could

be subject to the death penalty if convicted in the foreign territory for an offence that does not carry the death penalty here.

56. It does not appear to us that these affidavits are really relevant to any issues in these appeals. Moreover the information contained in the affidavits was available before the conclusion of the habeas corpus applications but no attempt was made to put it before the Court below and no explanation was advanced to this Court for the failure to do so. In all these circumstances we do not propose to allow the use of the affidavits. This conclusion really removes the basis of the Appellant's submission on bias. But it is of course open to him to raise the issue at the stage of the decision to return. It seems to us that there are difficulties in the way of the success of the submission.

57. It is well settled that the test of bias is whether a fair minded and informed observer knowing all the facts would conclude that there was a real possibility of bias (see **Lawal v Northern Spirit Ltd.** [2003] UKHL 35). The fair minded and informed observer should be credited with the knowledge that the decision to surrender the accused is that of the Attorney General and that the issue of the death penalty is one of the factors that he may need to consider before ordering the return of the accused. He would know that the absence of an undertaking by the foreign territory not to enforce the death penalty is not a bar to the surrender of the accused. Acting as a fair minded observer he would not think it suspicious or out of place for the Attorney general to ascertain the position on the death penalty before he makes a decision. He would conclude that by seeking the information the Attorney General may be thinking about the decision to surrender the accused but not necessarily that he has formed any judgment on the issue. Moreover the observer would know that the present holder of the office of the Attorney General is not the same person who held the office at the time that the undertaking was requested and that a fresh mind will now be applied to the issue of the surrender of the accused.

58. We turn now to the grounds of appeal in relation to the Appellant De Four. Of the grounds advanced by this Appellant two remain to be considered namely (a) that section 3 of the Taking of Hostages Act is unconstitutional as it deprives the accused of a trial by

a jury of his peers and (b) that the consent of the Director of Public Prosecutions (DPP) is required for the bringing of the extradition proceedings under the Taking of Hostages Act. We will consider these in turn.

59.    As to the first ground Counsel for the Appellant De Four wrote in his written arguments that "section 3 of the Taking of Hostages Act is unconstitutional and that a person who is extradited is denied trial by jury namely trial by his peers which is one of his due process rights under section 4 of the Constitution". Of course this ground is somewhat misconceived as section 3 of the Taking of Hostages Act does not govern the extradition process. The section creates an offence that is deemed by section 6 (1) of the Act to be an extraditable offence. So that where someone who is charged with an offence by a foreign state and the conduct of which he is accused if committed in Trinidad and Tobago would constitute an offence under section 3 it is an offence for which he may be extradited pursuant to the provisions of the Extradition Act. In the course of the hearing however this argument underwent somewhat of a reformulation and what was submitted is that an accused has a right to trial by a jury of his peers which is a fundamental right implied in the right to due process under section 4 of the Constitution. Therefore once someone is going to be tried by jury it must be by a jury of his peers unless the right was altered by the appropriate majority.

60.    Of course the effect of this argument is that whenever someone may be tried in a foreign country by a jury to permit his extradition would be a contravention of his constitutional right as he would not be tried by a jury of his peers. It may also mean that a foreigner who commits an indictable offence in this country could not be tried for the offence. However we are not persuaded that there is any merit in this submission.

61.    In this jurisdiction the right to trial by jury is contained in section 6 of the Criminal Procedure Act which provides;

"Every person committed for trial shall be tried on an indictment and subject to the provisions of this Act every such trial shall be held by and before a Judge and jury."

62.    That therefore is the scope of the right to trial by jury in this jurisdiction. There are two things that should be noted. First, there is no right to trial in every criminal matter but only where someone is committed to stand trial on indictment. The section explains how Parliament may lawfully create an offence and direct that it be tried summarily and hence without a jury. Second, the section is within an Act that clearly applies to domestic proceedings and has no application to extradition proceedings. It is not possible to extrapolate from this provision an entitlement to trial by a jury of one's peers when the person is liable to be extradited to stand trial in a foreign country.

63.    In Privy Council Appeal 51 of 2004 **The State v Brad Boyce** the Privy Council pointed out that to say that someone is entitled to due process means that he is entitled to be tried according to law. Lord Hoffman stated (at para. 13) that in this sense:

" .... the concept of due process incorporates observance of all the mandatory requirements of criminal procedure, whatever they may be. If unanimity is required for a verdict of a jury, a conviction by a majority would not be in accordance with due process of law. If the accused is entitled to raise a defence of alibi without any prior notice, a conviction after the judge directed the jury to ignore such a defence because it had not been mentioned until the accused made a statement from the dock would not be in accordance with due process of law."

64.    The Privy Council however explained that "due process" has a narrower constitutional meaning "namely those fundamental principles which are necessary for a fair system of justice". The question therefore is whether trial by jury is necessary for a fair system of justice. In our judgment it obviously is not and it does not constitute an ingredient in the due process of law in its narrow constitutional meaning. If there is no right to a trial by jury then the addition embellishment of a right to trial by a jury of one's peers does not arise.

65.    A similar conclusion was reached in **R v Stone** (1977 25 WIR 458). In that case the question arose whether trial by jury was a constitutionally protected right in Jamaica. The Jamaican Constitution like our Constitution contains no express provision protecting the right to trial by jury. The question arose whether it was so protected by necessary implication. The Court held that trial by jury although a matter of legal procedure was not a fundamental right protected by the Constitution.

66.    There is another reason in our judgment that this constitutional attack fails and it lies in the existing law provision at section 6 of the Constitution. Section 6 is as follows:

6.    (1)    Nothing in sections 4 and 5 shall invalidate-

(a)    an existing law;

(b)    an enactment that repeals and re-enacts an existing law without alteration; or

(c)    an enactment that alters an existing law but does not derogate from any fundamental right guaranteed by this Chapter in a manner in which or to an extent to which the existing law did not previously derogate from that right.

(2)    Where an enactment repeals and re-enacts with modifications an existing law and is held to derogate from any fundamental right guaranteed by this Chapter in a manner in which or to an extent which the existing law did not previously derogate from that right then, subject to sections 13 and 54, the provisions of the existing law shall be substituted for such of the provisions of the enactment as are held to derogate from the fundamental right in a manner in which or to an extent to which the existing law did not previously derogate from that right.

(3)    In this section-

"alters" in relation to an existing law, includes repealing

that law and re-enacting it with modifications or making different provisions in place of it or modifying it;

"existing law" means a law that had effect as part of the

law of Trinidad and Tobago immediately before the commencement of this Constitution, and includes any enactment referred to in subsection (1);

"right" includes freedom.

67.    For decades before the Constitution there were statutes governing extradition in this jurisdiction (see **Saroop v Beecham Maharaj and ors.** (1995) 3 TTLR 786). The previous Acts have been repealed by the Extradition Act but under the provisions of the previous Acts it was possible for persons on extradition to stand trial by other than by a jury of his peers. Therefore if the Extradition Act by permitting such a trial violates a fundamental right under section 4 it would be saved under section 6.

68.    In the circumstances we see no merit in these grounds of appeal.

69.    With respect to the other ground of appeal of the Appellant De Four that the consent of the DPP is required under the Taking of Hostages Act for the bringing of the extradition proceedings, there was of course no dispute that the consent of the DPP was not sought. The effect of this, Counsel submitted, was to render the proceedings a nullity. This submission was also advanced by Counsel for the Appellants Clarke and Demerieux. They relied on section 4 (1) the Taking of Hostages Act, which is as follows:

4 (1) Proceedings for an offence under section 3 shall not be instituted except by or with the consent of the DPP.

70.    It was submitted that under section 4 (1) the DPP had to give his consent before an accused is committed to stand trial in Trinidad and Tobago for an offence under

Page 25 of 31

section 3 of the Taking of Hostages Act. Since the role of the Magistrate is to consider whether the evidence before him would justify committal for trial he therefore had to be satisfied that the consent of the DPP was obtained.

71.    We however cannot agree with this submission. In the extradition proceedings before the Magistrate there are no proceedings under section 3 for the purpose of section 4 (1). The proceedings before the Magistrate it may be said are under the Extradition Act and there is no basis for saying that the provisions of that Act are to be read as if incorporated or contained in the Extradition Act. No charges under section 3 have been laid against the Appellants and there can be no proceedings under that section. The relevance of section 3 is that it contains the offences under the law of this jurisdiction which the conduct of the accused amounts to. The Magistrate's function under section 12(4) of the Extradition Act is, inter alia, to consider whether the conduct of the accused amounts to offences under section 3. The evidence of the conduct must be such as to justify the committal of the accused in this jurisdiction. The consent of the DPP is not necessary for the conduct to satisfy the test in section 12 (4) and the consideration by the Magistrate whether the conduct amounted to an offence under section 3 does not render that process a proceeding for an offence under section 3. We see no merit in this submission.

72.    With respect to the Appellants Clarke and Demerieux there remain two submissions to be considered. The first is that there is no "double criminality between the offences" contained in the US indictment and those identified under local law in the authority to proceed. Counsel submitted that the offences under US law had to be named, defined and characterized in identical terms as the offences under local law and in this case they were not. The US charges were all qualified by the words "if the death of any person results shall be punished by death" whereas these words did not occur in section 3 of the Taking of Hostages Act which it is alleged contained the corresponding offences.

73.    The premise on which Counsel's submission is made is however misconceived. The offences for which the accused is charged in the requesting State need not be named,

defined and characterized in identical terms under local law. What is relevant is that the conduct of the accused constitutes an offence against the law of Trinidad and Tobago. This is made clear by several sections of the Extradition Act. The first is section 6 (1) (b) which refers to conduct in defining what is an extraditable offence. This section is as follows:

> 6.    (1) For the purpose of this Act, an offence in respect of which a person is accused or has been convicted in a declared Commonwealth territory, or a declared foreign territory, is an extraditable offence if-
>
> (b)    the conduct of the person would constitute an offence against the law of Trinidad and Tobago if it took place in Trinidad and Tobago, or in the case of an extra-territorial offence, if it took place in corresponding circumstances outside Trinidad and Tobago, and would be punishable under the law of Trinidad and Tobago with death or imprisonment for a term of not less than twelve months;

74.    So that under section 6 (1) (b) what is relevant is the conduct of the person whose return is sought. If that conduct constitutes an offence in Trinidad and Tobago and meets the other criteria in the section then it is an extraditable offence.

75.    Section 6 (3) underlines that the label attached to the conduct is not relevant. This section provides as follows:

> (3) For greater certainty, it is not relevant whether the conduct referred to in subsection (1) is named, defined or characterised by the declared Commonwealth territory, or the declared foreign territory, in the same way as it is in Trinidad and Tobago

76.    Section 6 (4) also makes reference to conduct. This section is as follows:

"(4)    An offence constituted by conduct, whether in Trinidad and Tobago or not, that is of a kind over which Contracting States to an international Convention to which Trinidad and Tobago is a party are required by that Convention to establish jurisdiction, and which jurisdiction Trinidad and Tobago has so established, is an extraditable offence for the purpose of this Act."

77.    Again here the emphasis is on conduct of the kind over which Trinidad and Tobago and other contracting states to an international convention are required to establish jurisdiction. In relation to offences that are made extraditable offences under this section it therefore also makes no difference that the foreign offences are not named, defined or characterized in identical terms as the offences under local law if the conduct in question is of a kind over which this country and the other contracting States to the convention are required to establish jurisdiction.

78.    Reference may also be made to section 12 (4) where it is provided that the Magistrate shall commit the accused to custody to await his extradition if satisfied, inter alia, that the admissible evidence of the conduct of the accused had it occurred in Trinidad and Tobago would justify committal here for the offences set out in the authority to proceed.

79.    What therefore is relevant is not that the foreign offence of which the accused is charged carries the same name or label as the offence here but that the conduct of which he is accused would constitute an offence against the law of Trinidad and Tobago. There is no dispute that the alleged conduct of the Appellants described in the records of the case would amount to offences under section 3 of the Taking of Hostages Act.

80.    With respect to the reference in the US legislation, that if death results from the hostage taking it shall be punishable by death, it is clear that that refers to the penalty. Section 3 of the Taking of Hostages Act does not provide for the death penalty in respect of offences against the section but that does not alter the position since what is relevant is whether the conduct constitutes an offence under section 3.  This can be seen from

section 16 (4) of the Extradition Act. The Attorney General has the discretion to surrender a person for an extraditable offence not punishable by death in Trinidad and Tobago even though he could be sentenced to death in the territory to which he is surrendered.

81.    Counsel also submitted that the US law under which the Appellants were charged makes a conspiracy to commit the offence an offence whereas section 3 (2) of the Taking of Hostages Act does not do so. The submission as we understand it is that conspiracy to commit an offence is not an offence under local law. There is however no merit in this submission as is made clear by section 66 (1) of the Interpretation Act which so far as is relevant provides as follows:

"66.    (1)    Where-

(a)    a reference is otherwise made in any Act to an offence, then... that reference includes a reference to-

(i)    an attempt to commit that offence;

(ii)    aiding, abetting, counselling or procuring that offence; and

(iii)    a conspiracy to commit that offence.

82.    It is therefore clear from section 66 (1) (b) (iii) that where reference is made in any Act to an offence that that reference includes a reference to a conspiracy to commit the offence.

83.    Counsel however submitted that no reference can be made to the Interpretation Act in interpreting the provisions of the Taking of Hostages Act since the conspiracy offence is not an offence specified in the International Convention Against the Taking of Hostages and so is not an offence known to the Convention.   With all due respect to Counsel this submission is quite untenable.   The Convention requires Trinidad and Tobago to establish jurisdiction over the taking of hostages.  This has been done by the Taking of Hostages Act and the offences created by that Act are deemed by that Act to be

extraditable offences. No reason has really been advanced that when in interpreting the Taking of Hostages Act reference cannot be made to the Interpretation Act. The fact that the Act is intended to give effect to the Convention is certainly not a reason that reference cannot be made to the Interpretation Act.

84. The second and final submission made by Counsel for the Appellants Clarke and Demerieux is that the records of the case do not contain evidence to justify the charge of conspiracy to commit the offence. Counsel referred to the following statement of US law appearing in the records of the case:

> "A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identity of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and wilfully agrees to it, joining in the plan, that is enough to convict him for conspiracy even though he did not participate before and may play only a minor part. In fact, a conspirator can be held criminally responsible for all reasonable foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership"

85. Counsel submitted that having regard to that statement of the law there is no evidence in the records of the case to show that the Appellants had knowledge of the plan and wilfully joined in.

86. We do no agree with Counsel's submission. According to the records of the case, to establish conspiracy the Prosecutor will have to establish the following elements namely (a) that two or more persons entered into an agreement to commit the underlying offence of hostage taking and (b) they knowingly became a member of the conspiracy to commit the underlying offence. It is to the second element that Counsel's submission is directed. We have however perused the records of the case and there is evidence that the Appellants allegedly had the requisite knowledge.

87.    According to the records of case the Appellants Clarke and Demerieux were recruited by other conspirators to guard Balram Maharaj and he was handed over to them blind folded and with duct tape over his mouth. They guarded him for several days while the ransom negotiations were undertaken by others. Balram Maharaj however died in their custody. In the case of Demerieux the record of the case refers to a confessionary statement said to have been given by him. One of the statements he is alleged to have made is:

> "Zion Clarke updated Kevon Demerieux on the status of the ransom negotiations telling him that they were having trouble getting money from the man's family."

88.    And the Appellant Clarke is alleged to have given a statement in which he admitted:

> "On or about April 7, 2005 CONSPIRATOR "I" told ZION CLARKE that he needed to get a recording of Balram Maharaj's voice for use in their ransom negotiations. CONSPIRATOR "I" told ZION CLARKE that Balram Maharaj's nickname was 'Balo'".

89.    These are examples of the evidence in the records of the case that establish the requisite knowledge on the part of the Appellants.

90.    For these reasons we dismissed the appeals with costs.

M. Warner
Justice of Appeal

W. N. Kangaloo
Justice of Appeal

A. Mendonca
Justice of Appeal